## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-20874-CR-ALTONAGA

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**GUY PHILIPPE**,

      Defendant.

_____/

### OMNIBUS ORDER

In this Order the Court addresses four motions filed by the parties on February 28, 2017: (1) Defendant, Guy Philippe's Motion to Dismiss Indictment for Unreasonable and Unnecessary Post Indictment Delay ("First Motion to Dismiss") [ECF No. 36]; (2) Defendant's Motion to Abate Prosecution Based on Immunity as a Foreign State Official ("Motion to Abate") [ECF No. 37]; (3) Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Over the Defendant ("Second Motion to Dismiss") [ECF No. 38]; and (4) Plaintiff, the United States of America's Consolidated Motions *In Limine* ("*In Limine* Motion") [ECF No. 39].  The Court has carefully reviewed the parties' written submissions[1] and applicable law.

    **1.**     **First Motion to Dismiss**

        **A.**     **Background**

On November 22, 2005, a grand jury returned a three-count Indictment [ECF No. 3], charging Defendant with: conspiring to import into the United States a controlled substance in violation of 21 U.S.C. section 952(a) (Count 1); conspiring to conduct financial and monetary transactions derived from the proceeds of importing controlled substances into the United States

---

[1] The responses and reply memoranda appear at docket entries 42–45 and 51–53.

in violation of 18 U.S.C. sections 1956 and 1957 (Count 2); and engaging in a monetary transaction of more than $10,000 with the controlled substance proceeds in violation of 18 U.S.C. sections 1957 and 2 (Count 3).  An arrest warrant was issued on November 22, 2005 (*see* Arrest Warrant [ECF No. 4]), and the case was transferred to fugitive status on January 31, 2006 (*see* Notice [ECF No. 5]).  The case file remained inactive until January 6, 2017, when the Government filed a Motion to Unseal Indictment [ECF No. 7], advising Defendant had been arrested.

Defendant had his initial appearance on January 6, 2017 (*see* Minute Order [ECF No. 9]); counsel for Defendant filed her notice of appearance on the same day (*see* Notice [ECF No. 10]); and on January 13, 2017, the Court entered its Order [ECF No. 21] setting the case for trial during the two-week trial period beginning February 21, 2017.  At a February 6, 2017 status conference (*see* Minute Entry [ECF No. 32]), defense counsel requested and was granted a continuance of the trial (*see* Order [ECF No. 34]).  Trial is scheduled for the two-week trial period beginning April 3, 2017.  (*See id.*).

In his First Motion to Dismiss, which contains no evidentiary submissions, Defendant argues the Government never made a minimal effort over the last decade, let alone a good faith effort, to secure his presence and bring him to trial, even after he went to the U.S. embassy in Haiti in 2006, "effectively placing himself on U.S. soil."  (First Mot. to Dismiss 2).  Defendant asserts he never affirmatively concealed his whereabouts or took steps to avoid being apprehended; rather he lived openly and with a "very public existence."  (*Id.* 5).  According to Defendant, to his knowledge, the first and only effort made to arrest him occurred on January 5, 2017, when "United States agents" "kidnapped" him at a radio program he was attending after being elected senator in Haiti.  (*Id.* 2, 5).  Consequently, Defendant asks the Court to dismiss the

Indictment, arguing the Government did not comply with its "'constitutional duty to make a diligent, good-faith effort' to locate and apprehend" him and bring him to trial, *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986) (quoting *Smith v. Hooey*, 393 U.S. 374, 383 (1969)), under the Six Amendment's Speedy Trial Clause.

To this, the Government insists that shortly after the Indictment, it attempted to arrest the Defendant, who is a former member of the Haitian National Police and leader of an insurgency that led to the 2004 ouster of then-Haitian president Jean Bertrand Aristide. (*See* Gov't Resp. [ECF No. 43] 1–2). Similar to Defendant's unsupported Motion, the Government offers no evidentiary support for its representations regarding the steps taken over the last 11 years to apprehend Defendant.[2] From the Government's submission, the Court understands its efforts to locate Defendant to consist of the following:

- In early 2006, plans to lure Defendant to the United States for his arrest were unsuccessful. A travel authorization letter was issued to Defendant, who went to the U.S. embassy in Haiti and was given a visa for travel on April 6, 2006, as he indicated he would be on a flight from Haiti to Fort Lauderdale on April 6, 2006. Defendant did not take the flight. The Government does not explain why it did not arrest Defendant when he was present at the U.S. embassy and obtained the travel visa.

- *During the 15 months that followed, from April 2006 to July 2007, the Government engaged in no efforts to locate Defendant.*

- In July 2007, a highly publicized operation involving helicopters and U.S. presence in the hills above Les Cayes, on Haiti's remote southern peninsula, did not succeed in locating Defendant.

---

[2] Neither party has requested an evidentiary hearing.

CASE NO. 05-20874-CR-ALTONAGA

- In August 2007, defense counsel Richard Danosh advised the United States Attorney's Office and the Drug Enforcement Administration that Defendant would surrender if the United States agreed to certain conditions regarding the length of his prison sentence and dismissal of the money laundering charge. When the assurances were not given, Defendant did not surrender.

- *During the seven months that followed, from August 2007 to March 2008, the Government did nothing to arrest Defendant.*

- On March 24, 2008, another unsuccessful arrest attempt was made in Pestel, Haiti, a remote area with some 80,000 people ensconced in a natural fortress of rugged mountains. This was followed by a deployment of DEA agents and Haitian National Police officers to the area surrounding Defendant's suspected whereabouts, with checkpoints and contact made with residents for information leading to Defendant's arrest.

- From March 30, 2008 to April 3, 2008, DEA agents had contact with Haitian law enforcement for the purpose of setting up checkpoints in the area Defendant, who enjoyed the protection of bodyguards, was believed to be residing. The checkpoints were not successful.

- On April 5, 2008, a DEA special agent made contact with Defendant's wife and informed her of the arrest warrant and discussed Defendant's surrender. The wife advised Defendant was upset with the United States because of the two prior failed arrest attempts, and stated during the July 16, 2007 arrest attempt she sustained injuries, and during the March 24, 2008 arrest attempt her home was damaged.

- On April 9, 2008, an agent spoke to Defendant, who confirmed the April 5 conversation between a DEA agent and Defendant's wife.  Defendant inquired about his exit from Haiti if he surrendered at the U.S. embassy.  The agent advised the DEA would provide a plane and safe passage.  Defendant stated he would call the agent back.

- On April 10, 2008, Defendant's wife made contact with the agent and asked questions about Defendant's potential sentence and location of any incarceration.  She indicated she would need time to pack before leaving Haiti.

- On April 17, 2008, Defendant called a DEA agent and stated he was going to surrender to the U.S. embassy as soon as his wife was ready to leave, in a week or two.  He stated he was a man of his word.

- In August 2008, Defendant contacted a DEA agent and said he would be ready to surrender in a few days.  He did not.

- *During the five months that followed, from August 2008 to January 2009, the Government did nothing to arrest Defendant.*

- On January 29, 2009, Defendant spoke to a DEA special agent and was told he needed to present himself to the DEA to resolve the pending warrant.

- On February 5, 2009, Defendant spoke to a DEA special agent and indicated he had no plans to surrender given the state of the elections in his country.  He said the only way he would go to the United States was if he was captured.  He also said if Haitian authorities tried to capture him, he would fight them and was prepared to die.

- On February 6, 2009, Defendant repeatedly called a DEA special agent stating he believed someone from the DEA had requested his name be removed from the

Provisional Elections Commission certified list of qualified candidates.  Defendant stated he was going to start setting fires and was prepared to die protecting his country.

- On May 14, 2009, agents, with the assistance of Haitian law enforcement, engaged in a foot chase of Defendant, who was successful in absconding in an area of dense vegetation.  A subsequent search was unsuccessful in locating Defendant.

- On May 26, 2009, Defendant reached out to an FBI agent, indicating he was willing to turn himself in if he would be treated respectfully.  He did not surrender.

- From June 26–29, 2009, U.S. agents and Haitian law enforcement unsuccessfully searched for Defendant in an area of dense vegetation after receiving actionable intelligence.

- *During the 13 months that followed, from June 2009 to July 2010, the Government did nothing to arrest Defendant.*

- In July 2010, the United States received information Defendant was in custody, but this proved to be false.  The United States Marshal Service was advised efforts were underway to arrest Defendant.

- *During the 21 months that followed, from July 2010 to April 2013, the Government did nothing to arrest Defendant.*

- In April 2013, DEA agents interviewed sources and prepared an operation to arrest Defendant.

- *During the eight months that followed, from April 2013 to December 2013, the Government did nothing to arrest Defendant.*

- In December 2013, Defendant submitted a signed Freedom of Information Act request to the DEA, seeking information about his files and referencing "in the Matter of Philippe, Guy a/k/a Piti-piti, Fugitive NCIC."

- *During the four months that followed, from December 2013 to April 2014, the Government did nothing to arrest Defendant.*

- On April 28, 2014, with the assistance of Haitian law enforcement, agents attempted to arrest Defendant at a hotel they believed he was in.  Although he had been present there, he left sometime before the agents' arrival.

- *During the 14 months that followed, from April 2014 to June 2015, the Government did nothing to arrest Defendant.*

- On June 22, 2015, agents, assisted by Haitian law enforcement, attempted to arrest Defendant in Pestel, Haiti.  The agents encountered a road block and were forced to abort the mission.  They came under sporadic gunfire and encountered several roadblocks and a carjacked United Nations vehicle.

- *During the indeterminate time period between June 2015 and "[e]fforts begun in 2016" (id. 7 (alteration added)), the Government did nothing to arrest Defendant.*

- Efforts to arrest Defendant in 2016 were unsuccessful until the Haitian National Police took Defendant into custody on January 5, 2017.

(*See id.* 2–7).

In his Reply [ECF No. 51], Defendant again emphasizes he was present at the U.S. embassy in Haiti some four months after the Indictment was returned, in April 2006, yet the Government did not arrest him then.  (*See id.* 1–2).  He states he is a public figure in Haiti; he even ran for president in 2007 and lost.  (*See id.* 4).  He provides four exhibits, including a

December 2007 letter from his wife to the U.S. Ambassador in Haiti, asking, "who were these unidentified armed men[]" that entered her house? (*id.* 3; *id*, Ex. B (alteration added)), signaling she did now know DEA agents were looking for Defendant.  He also states in 2013 he hired an attorney in the United States "to find out whether there was a warrant for his arrest" (*id.* 4), and "attempted to surrender himself" (*id.* 5).  He asserts the delay in the prosecution will make it impossible for him to obtain bank records from over 18 years ago to defend the charge in Count 3, but does not explain what those records are or whether in fact it is impossible to obtain any desired records.  (*See id.*).

### B.    Analysis

The United States Supreme Court long ago adopted a balancing test in *Barker v. Wingo*, 407 U.S. 514 (1972), in which the prosecution's and defendant's actions are weighed to determine whether a Sixth Amendment violation of the right to speedy trial has occurred.  *Id.* at 530.  The Court identified the following factors courts should assess in determining whether a defendant has been deprived of this right: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant.  *Id.* at 530–32.  "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."  *Id.* at 533 (alteration added; footnote call number omitted).

The first factor is "a double enquiry," wherein the court first decides whether the delay is long enough — that is, whether "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay" — to trigger analysis of the *Barker* factors.  *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (citing *Barker*, 407 U.S. at 530–31).  "[I]f a delay is not presumptively prejudicial, a defendant's Sixth Amendment right

is not deemed violated and the remaining factors need not be considered." *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999) (alteration added; citation omitted).

As to the first factor, "because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530–31 (footnote call number omitted).  Notably, "delays exceeding one year are generally found to be 'presumptively prejudicial.'" *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (citation omitted).  In *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), the Eleventh Circuit found a two-year delay between indictment and trial required it to proceed with the *Barker* test.  *See id.* at 1337.  Here, the Government acknowledges the 11-year delay clearly satisfies the presumptively prejudicial test and extends well beyond the one-year minimum necessary to satisfy the presumption.  At issue then are the remaining three *Barker* factors.

With regard to the second factor, "[t]o determine whether [a defendant's] right to a speedy trial has been violated the conduct of the government must be weighed against the conduct of the defendant." *Bagga*, 782 F.2d at 1543 (alterations added; citing *Barker*, 407 U.S. at 530).  And it is the Government that "bears the burden of establishing valid reasons for the delay." *United States v. Villareal*, 613 F.3d 1344, 1351 (11th Cir. 2010) (citing *Ingram*, 446 F.3d at 1337).  "Where the missing individual is the defendant, the government is not required to exhaust all conceivable avenues in finding him." *United States v. Spaulding*, 322 F. App'x 942, 946 (11th Cir. 2009) (internal quotation marks and citation omitted).

"[D]ifferent weights should be assigned to different reasons" given for the delay. *Barker*, 407 U.S. at 531 (alteration added).  A "neutral reason" like "negligence" "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such

circumstances must rest with the government rather than with the defendant." *Id.* In the case of a "defendant [who] is free and residing outside the jurisdiction where the indictment was returned, however, the government's negligence does not necessarily tip the scale in the defendant's favor." *Spaulding*, 322 F. App'x at 3 (alteration added; internal quotation marks and citation omitted). "A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay." *Villareal*, 613 F.3d at 1351. In any event, "the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith." *Id.*

In the intervening 11 years from the time of the Indictment's return to Defendant's arrest, it appears the Government proactively initiated attempts to locate Defendant — as opposed to responding to overtures by Defendant or his attorneys — on approximately ten occasions, some of which are single events and others which appear to be activities clustered around a particular date. These consist of: the July 2007 operation; the two March 2008 attempts; the March–April 2008 attempts; the April 2008 contact with Defendant's wife; the May 2009 foot chase; the June 26–29, 2009 searches in dense vegetation; the April 2013 interviews and planning; the April 2014 attempt at a hotel; the June 2015 attempt in Pestel, Haiti amid gunfire and roadblocks; and non-specific efforts in 2016. (*See* Resp. 2–7). The other instances of contact between U.S. law enforcement and the Defendant or his wife all involve communications initiated by Defendant, his lawyer, or his wife. These consist of: Defendant's appearance at the U.S. embassy in Haiti in late March or early April 2006; the August 2007 contact between Mr. Danosh and Government agents; the April 2008 contact initiated by Defendant's wife; the April 2008 phone call Defendant placed to a DEA agent; the January 2009 conversation Defendant initiated with a DEA agent; the February 2009 conversation Defendant initiated with a DEA agent; the February

6, 2009 repeated phone calls Defendant placed to a DEA agent; the May 2009 contact initiated by Defendant with an FBI agent; and Defendant's December 2013 FOIA request.  (*See id.*).

The timeline of events and inaction, reconstructed from the parties' written submissions, shows no evidence of bad faith by the Government.  *See Villareal*, 613 F.3d at 1351.  What it does show is the Government's actions and inactions are situated in the middle ground between diligence and negligence, somewhat closer to negligence than diligence given the passage of time and large gaps of time in which the Government appears to have taken no steps to arrest Defendant.  *See Spaulding*, 322 F. App'x at 3–4.  A rough counting supports the finding the Government did nothing to locate and arrest Defendant for 91 months – over seven years out of the 11 years at issue.  *See Villarreal*, 613 F.3d at 1353 (noting "some concerns about gaps in the government's efforts to locate" the defendant); *Doggett*, 505 U.S. at 657 (stating the government's persistent negligence in failing to make any efforts to arrest the defendant, for eight-and-a-half years, far exceeded the threshold needed to state a speedy trial claim (citation omitted)).  And during some of this time, Defendant appears to have been readily accessible: in 2006 at the U.S. embassy, and in 2007 when he ran for president of Haiti.  *See Velasquez*, 749 F.3d at 177 ("If authorities choose to ignore available leads about a suspect's whereabouts in favor of other tasks, they may nonetheless be found negligent within the context of the speedy trial right.").

The Court recognizes the Government engaged in multiple attempts to locate Defendant in the remote areas of Haiti where he was hiding, often encountering gunshots, roadblocks, and other threats in its efforts to apprehend Defendant.  It worked with Haitian authorities; and contacted Defendant's wife, numerous individuals, and Defendant himself, all in an effort to execute the warrant and bring Defendant to trial.

Yet, "[n]egligence still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Id.* at 175 (alteration added; internal quotation marks and citation omitted; alteration added); *see also United States v. Garza*, 222 F. App'x 947, 948 (11th Cir. 2007) (noting ATF agent's initial physical surveillances of the defendant's father's residence, but ensuing failure to make any further surveillances or visits to the residence for over five years). "The longer the delay," and the greater the length of time the Government did nothing after an indictment is returned as compared to the efforts it did undertake, "the more heavily the [G]overnment's negligence weighs against it." *Spaulding*, 322 F. App'x at 3 (citing *Doggett*, 505 U.S. at 657–58). On this record and on balance, the Government has not satisfied its burden of showing it made a "diligent, good-faith effort" to locate the Defendant. *Smith*, 393 U.S. at 383. This second factor weighs somewhat against the Government.

As to the third factor, Defendant admits "there is a plausible argument that he did not aggressively assert his right to a speedy trial" (First Mot. to Dismiss 5), but then attempts to disprove his own concession (*see id.* 5–6). There is certainly more than a plausible argument Defendant did not assert his right to a speedy trial.

Contrary to his assertions, Defendant was most certainly aware of the existence of the Indictment shortly after it was returned, even having his attorney deliver a message to U.S. officials seeking assurances of a lighter sentence and the dismissal of one of the charges in exchange for a voluntary surrender. (*See* Gov't Resp. 2–7). Defendant had direct communications with U.S. officials, during which he assured he was a "man of [his] word" and would turn himself in, yet he later reneged on that promise, even fleeing on foot when pursued by U.S. and Haitian authorities. (*Id.* 5 (alteration added)). Defendant waited until after his arrest

to invoke his right to a speedy trial.  *See Velasquez*, 749 F.3d at 184 (concluding knowledge of the indictment is "the appropriate measure for the timely assertion of the speedy trial right"); *Bagga*, 782 F.2d at 1542 (stating the defendant "cannot be charged with a failure to request a speedy trial" during the period before he learned of the indictment but once he knew of the indictment and remained in a foreign country for three years, the defendant's actions show he "was not concerned with a speedy trial").  On these facts, it is clear Defendant "did not want a speedy trial."  *Barker*, 407 U.S. at 536.  Consequently, this factor weighs against Defendant.

Last, with regard to the fourth factor — prejudice to Defendant — given the first three *Barker* factors do not all weigh heavily against the Government, Defendant "must demonstrate actual prejudice to succeed on his speedy trial claim."  *Villareal*, 613 F.3d at 1355 (citation omitted); *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003) (stating a defendant must show actual prejudice unless the first three *Barker* factors "all weigh heavily against the government." (internal quotation marks and citations omitted)).   In this regard, the Court considers several interests.  One is preventing oppressive pretrial incarceration, which, as the facts demonstrate, did not take place here.  Other interests include minimizing anxiety and concern of the accused, and limiting the possibility the defense will be impaired.  *Barker*, 407 U.S. at 532.  Prejudice from "the inability of a defendant adequately to prepare his case skews the fairness of the entire system," and is "the most serious" of the interests the speedy trial right was intended to protect.  *Villareal*, 613 F.3d at 1355 (citation omitted).

As noted by the Government, in the Motion, Defendant offers nothing more than the unsupported assertion it will be "virtually impossible" for him to "receive a fair trial."  (First Mot. to Dismiss 6).  Conclusory allegations of prejudice are insufficient to satisfy Defendant's burden.  *See United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1996) ("This court has

consistently held that conclusory allegations of prejudice, including allegations of witnesses' faded memories, are insufficient to constitute proof of actual prejudice." (citation omitted)).

In his Reply, for the first time, Defendant asserts it will be impossible for him to obtain bank records to defend the charge in Count 3.[3]   (*See* Reply 5).   With the exception of Defendant's unsubstantiated assertion he will not be able to obtain bank records from over a decade ago to defend the charge in Count 3, the fourth *Barker* factor weighs against Defendant. *See United States v. Cadet*, 521 F. Supp. 2d 1351, 1356 (S.D. Fla. 2007) (denying dismissal of indictment where defendant, who knew of his involvement in a criminal investigation and fled to Haiti, rather than demonstrating prejudice, "merely makes a blanket assertion that a delay of ten years is 'presumptively prejudicial.'").

The four *Barker* "factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."   *Barker*, 407 U.S. at 533 (footnote call number omitted).  Here, the first factor weighs heavily against the Government, the second factor weighs slightly against the Government, the third factor weighs heavily against Defendant, and the fourth factor weighs against Defendant.  Consequently, the Court declines to find a violation of Defendant's Sixth Amendment right to a speedy trial.

Defendant makes an alternative request the Court dismiss the Indictment on the basis of Federal Rule of Criminal Procedure 48(b).[4]   (*See* First Mot. to Dismiss 7–8).   Given the

---

[3] "A reply memorandum may not raise new arguments or evidence, particularly where the evidence was available when the underlying motion was filed and the movant was aware (or should have been aware) of the necessity of the evidence."  *Baltzer v. Midland Credit Mgmt., Inc.*, No. 14-20140-CIV, 2014 WL 3845449, at *1 (S.D. Fla. Aug. 5, 2014) (citations omitted).

[4] Under Rule 48(b), the court may dismiss an indictment "if unnecessary delay occurs in" "(3) bringing a defendant to trial."  FED. R. CRIM. P. 48(b).

foregoing *Barker* analysis and the conclusion reached Defendant's right to a speedy trial has not been violated, the Court similarly declines to dismiss the Indictment on this ground.

### 2.    Motion to Abate

Defendant next requests the Court abate this prosecution for six years because on November 20, 2016, he was elected to the Senate in Haiti; his six-year term began on January 9, 2017; and he is entitled to immunity as a foreign state official in accord with the Constitution of Haiti, the Vienna Convention, and "long standing [sic] customary international law." (Mot. to Abate 1). This Motion warrants only brief discussion.

First, the Haitian Constitution provides that senators begin service on the second Monday of January following their election. (*See* Gov't Resp. [ECF No. 45] 5). The same Constitution grants immunity to legislators and requires the Haitian Senate provide authorization before a senator may be arrested. (*See id.*). Defendant, while elected a senator in November 2016, had not begun service as a senator on the date of his arrest, January 5, 2017. Thus, he is not entitled to immunity under the Constitution of Haiti. Indeed, Defendant's arrest in Haiti was brought about by a "Mandate to Bring" issued by a judicial tribunal in Les Cayes, Haiti (*id.* 3), and the government of Haiti agreed to Defendant's transfer to the United States to stand trial here.[5]

As to Defendant's citation to the Vienna Convention, the Government assumes the applicable convention to be the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, given Defendant advances his status as a senator as the basis for the requested abstention and provides little clarity on which convention he relies. (*See* Gov't Resp. 7 & n.3,

---

[5] In his Reply [ECF No. 52], Defendant argues his arrest and expulsion violate the Constitution of Haiti. (*See id.* 1). He attaches as exhibits medical records and photos showing injuries sustained by a person shot during his arrest, and recent records from March 2017 showing there was no warrant outstanding in Haiti and the Haitian Senate has voted unanimously the arrest was illegal and has demanded Defendant's return to Haiti. (*See id.* 2–3; Ex. A–E). Given the Haitian Senate just voted on March 14 demanding Defendant's return, and again, the Government does not have the opportunity of responding to this, the Court does not address the effect of this development in its analysis.

4).  That Convention, however, provides immunity from criminal prosecution only to diplomatic agents and their families and staff, and thus it does not furnish support for a claim of immunity of a senator-elect, as Defendant was on the date of his arrest or still might be.  Accordingly, Defendant is not entitled to prosecutorial immunity.

### 3.       Second Motion to Dismiss

Defendant's second attempt at securing a dismissal of the Indictment is based on the accusation the Government engaged in outrageous misconduct warranting a finding his due process rights were violated.  (*See* Second Mot. Dismiss 3).  In support, Defendant narrates the events that transpired on January 5, 2017 resulting in his arrest and eventual flight to Miami, where he has since remained detained at the Federal Detention Center.  (*See id.* 1–3).  The outrageous conduct he maintains the Government engaged in consists of: (1) Defendant being surrounded by men with guns shouting they were there to kill him; (2) having shots fired around him while one of his security guards took two bullets for him; (3) being grabbed by U.S. agents and having a hood placed over his head; (4) being forced to wait in a very hot car for three to four hours without food or water; and (5) then being detained in an American house for hours without food or water before being flown to the United States.  (*See id.*).  According to Defendant, the Second Circuit has recognized there are circumstances where the conduct of the United States is so outrageous, as here, that due process will compel dismissal of an indictment. (*See id.* 4–6 (discussing *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974)).

While the Eleventh Circuit has "never acknowledged the existence of the outrageous government conduct doctrine," it has clarified "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts."  *United States v. Jayyousi*, 657 F.3d 1085, 1111 (11th Cir. 2011) (finding the defendant, charged with support for Islamist

violence overseas, failed to show government intrusion into his underlying criminal conduct where his claim of mistreatment concerned the time he spent at a Navy brig after the conclusion of his criminal acts and prior to the indictment).  Thus, "[o]utrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees."  *Id.* (alteration added; internal quotation marks and citations omitted); *see also United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993) ("[I]n the rarest and most outrageous circumstances government conduct might violate that fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment." (alteration added; internal quotation marks and citations omitted)).

Defendant's claim of outrageous government conduct concerns his treatment during the hours following his capture and before his flight to Miami.  None of the purportedly outrageous activities relate to Government misconduct associated with the criminal acts Defendant is charged with.

Moreover, the Government details very different facts in its Response [ECF No. 44]. According to the Government, the length of time during which it can even be accused of misconduct is a six-hour time span from the time of Defendant's arrest until U.S. law enforcement agents flew Defendant to this District, and during five of those hours, Defendant "was either in an air-conditioned vehicle, an air-conditioned undisclosed location[,] or an air-conditioned [U.S.] airplane."  (*Id.* 1 (alterations added)).  With regard to the shots fired when Defendant was apprehended at the radio station, Defendant was escorted by 12 individuals, three of whom were armed with long guns; U.S. law enforcement was not present; Defendant's escorts and armed escorts closed in on the Haitian arrest team and a single Haitian officer fired shots

into the air as a security precaution.  (*See id.* 3).   The Government states all of the persons

surrounding Defendant, including the three armed men, fled and no one was injured.  (*See id.*).

Again, that someone was in fact injured is shown in the exhibits furnished by Defendant in his

Reply [ECF No. 52].

On these facts, the Court does not find the Government's conduct was outrageous, let

alone so shocking to the universal sense of justice that it violates Defendant's due process rights

and warrants dismissal of the Indictment.   In any event, Defendant "cannot defeat personal

jurisdiction by asserting the illegality of the procurement of his presence."   *United States v.*

*Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997) (internal quotations marks and citation omitted).

### 4.    *In Limine* Motion

The Government requests Defendant be prevented from: (1) presenting evidence at trial

regarding the circumstances of his expulsion from Haiti or arguing immunity as a senator; (2)

invoking the marital confidential communications privilege or spousal testimonial privilege if he

calls his wife as a defense witness; (3) invoking the Fifth Amendment right against self-

incrimination if the wife testifies as a defense witness; and (4) raising as a defense the monies

associated with the money laundering counts were derived from the U.S. government or people

authorized to work on behalf of the United States, because Defendant did not comply with

Federal Rule of Criminal Procedure 12.3.[6]  (*See In Limine* Mot. 1).  The Government failed to

confer with Defendant before filing the Motion, as required by Local Rule 88.9(a) of the U.S.

District Court for the Southern District of Florida.  *See* S.D. FLA. L.R. 88.9(a).  Had it done so, it

would have discovered: (1) Defendant has no intention to address the issue of immunity with the

---

[6] Rule 12.3, titled "Notice of a Public–Authority Defense," requires a defendant to furnish notice to the Government of an intention to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense.  *See* FED. R. CRIM. P. 12.3.

jury; (2) it is premature to rule out evidence regarding the circumstances of his apprehension until trial; (3) Defendant does not know who the witnesses at trial are and whether they will or may invoke any spousal privilege; (4) Defendant agrees witnesses taking the stand voluntarily should not be allowed to invoke the Fifth Amendment privilege; and (5) Defendant is aware of his obligations under Rule 12.3 and does not find the rule applicable here.  (*See* Resp. [ECF No. 42] 1–2).

In accordance with the foregoing, it is **ORDERED AND ADJUDGED** as follows:

Defendant's Motion to Dismiss Indictment for Unreasonable and Unnecessary Post Indictment Delay **[ECF No. 36]**, Motion to Abate Prosecution Based on Immunity as a Foreign State Official **[ECF No. 37]**, and Motion to Dismiss for Lack of Personal Jurisdiction Over the Defendant **[ECF No. 38]** are **DENIED**.  The Government's Consolidated Motions *In Limine* **[ECF No. 39]** are **DENIED** as moot or premature; the Government may raise appropriate evidentiary objections at trial.

**DONE AND ORDERED** in Miami, Florida this 17th day of March, 2017.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record